IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DOREEN MAYNARD          *
                        *
v.                      *     Civil Action No. WMN-15-3532
                        *
ST. STEPHEN'S REFORMED  *
EPISCOPAL CHURCH        *
                        *
    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

## MEMORANDUM

Before the Court are Plaintiff Doreen Maynard's "Motion for Judgement upon the Pleadings," (MJP) ECF No. 75, and a Cross Motion for Summary Judgment (Cross Motion) filed by Defendant St. Stephen's Reformed Episcopal Church (Defendant or St. Stephen's). ECF No. 98. Also pending is Plaintiff's motion to strike declarations and many of the exhibits that Defendant submitted with its Cross Motion. ECF No. 103. All of the motions are now ripe. Upon review of the pleadings and the relevant case law, the Court determines that no hearing is necessary, Local Rule 105.6, and that Plaintiff's motions will be denied and Defendant's motion will be granted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Proceeding <u>pro se</u>, Plaintiff brings three claims of retaliation under Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. §§ 2000e et seq.,[1] against her former
employer, St. Stephen's.  The first claim arises out of
Plaintiff's suspension, with pay, on October 9, 2014, and the
second claim arises out of the termination of her employment
three days later.  In her third claim, Plaintiff alleges that
Defendant continued to retaliate against her after her
termination by contacting a potential employer and interfering
with her efforts to find new employment.  While the parties
proffer different motives for the actions taken by the other,
the facts and chronology of events that led to the suspension,
termination, and contact with another employer are all well
documented and generally undisputed.  As detailed below,
Plaintiff disliked some decisions made by her supervisor,
responded to those decisions in a somewhat insubordinate manner,
proceeded to violate a workplace policy and, when it became
apparent that her job might be in jeopardy, raised an
unsubstantiated claim of discrimination so that Defendant would
be unable to terminate her employment without facing a claim of
retaliation.  The facts and chronology of events are as follows.

---

[1] Plaintiff initially also brought claims under the Age
Discrimination in Employment Act of 1967 (ADEA), as amended, 29
U.S.C. §§ 621, et seq.  The Court dismissed the ADEA claims on
May 12, 2016, after concluding that Plaintiff had failed to
exhaust her administrative remedies as to those claims.  ECF
Nos. 23 and 24.

St. Stephen's is a church located in Eldersburg, Maryland, which operates a school for students from kindergarten through eighth grade - the St. Stephen's Classical Christian Academy (SSCCA). The St. Anselm program is a program within the school that serves students with language-based learning differences. John Dykes is the headmaster of SSCCA and Johanna Judy is the Lead Teacher for the St. Anselm program. Eric Jorgensen is the pastor of St. Stephen's and the Chairman of the SSCCA Board.

In September of 2013, Plaintiff was hired to work as a part-time teacher at SSCCA in the St. Anselm program. Johanna Judy was Plaintiff's immediate supervisor. As a part-time teacher working 4 hours and 45 minutes per day, Plaintiff was paid a salary of $15,000 for the nine month school year. After requesting that she be moved to a full-time teaching position, Plaintiff signed a new contract on September 4, 2014, with a salary of $22,000. Shortly after the start of the school year, however, in early October, Plaintiff requested that she be returned to part-time status.

In response to Plaintiff's decision to return to part-time status and an increase in the number of students enrolled at SSCCA, Dykes decided to hire another part-time teacher. Dykes and Judy then began the process of revising the teaching schedule to accommodate Plaintiff's part-time status and the addition of the new part-time teacher. Plaintiff was not

pleased with the proposed schedule and voiced that displeasure in a series of emails that quickly escalated in their level of contentiousness. On October 7, 2015, Plaintiff emailed Dykes and stated that, while she was "happy to hear" that a new part-time teacher would be hired, she wanted to take the opportunity to remind Dykes that they had previously discussed Plaintiff teaching four morning classes and the new teacher taking Plaintiff's afternoon classes so that Plaintiff's hours were not stretched out all day. Dykes Decl., Ex. E. She also requested that she be included in the scheduling process. The next afternoon around 1 o'clock, Plaintiff sent Dykes an email informing him that she had shared some of her ideas for a workable schedule with Judy and again asked to be allowed to give input into the scheduling changes. Id., Ex. F.

Around 4:30 in the afternoon of October 8, 2014, Dykes responded and provided the schedule for the four classes that Plaintiff would be teaching, a schedule which would require her to be at the school from 9:00 to 1:40 each day. Id., Ex. G. About an hour later, Plaintiff responded by sending a lengthy email to Dykes taking issue with the proposed schedule. She expressed that she was "becoming concerned" that she was not included in the process of developing the schedule and protested that the proposed schedule was inconsistent with her "August offer to give up the raise you gave me in order to hire another

4

PT person this Fall so I could work part time in the mornings from now on." Id., Ex. H at 1.  She also complained that, under this schedule, she would have a greater teaching load than Judy. She further complained that "there are a lot of misunderstanding happening about my offer" and, unless they can be work out as previously agreed upon, "it is only fair that I be given the opportunity to consider withdrawing my offer for now and remain working the full time hours and with the full-time pay that are currently on my contract."  Id., Ex. H at 2.

Dykes responded at 8:01 that evening and stated that he had read 1/3 of the email but would not have time to read and decipher the rest until the next week.  He also declared, that "[t]he schedule is already set," and that Plaintiff's plan, which had her coming in at 8:00 in the morning for a planning period, instead of 9:00 to teach, was unacceptable.  Id., Ex. I. He stated that he did not recall any discussion over the summer where specific hours were discussed and that "[y]ou need to work when we have work and we will do our best to get you out as early as possible," which, under the proposed schedule was 1:40. Id.

Plaintiff responded by email about an hour later.  The email began:

> I will not agree to sign a different contract, take
> less money or work any different employment terms than
> the ones I have now under my current contract until

you find the time to read my emails and meet with me
to work out this misunderstanding about my August
offer.

Id., Ex. J.  She further criticized Dykes for not reading her

previous emails and considering her concerns and concluded:

Please let me know when you can find the time to meet
and discuss my offer the way I presented it to you in
August.  I would appreciate it if you would read my
emails before that meeting.  Thank you for your
attention to my legitimate and reasonable requests.

Id.

One hour later, at 10:01 p.m., Dykes responded:

I will speak to you tomorrow concerning your email at
12:15 sharp in my office.  Understand that you will
not dictate the terms of your part time employment nor
will you give me any directive as to the way that I
must respond to you.  Starting next quarter, you will
be part time if you continue to serve at SSCCA.  The
tone of your email is inappropriate and will be
addressed tomorrow at 12:15.

Id., Ex. K.  Dykes copied the email to Judy and asked her to

attend the meeting the next day.

One hour later, at 10:54, Dykes sent another email.  By

this time, Dykes had read Plaintiff's long email of October 7,

and responded that the option for Plaintiff to work full time

had passed and that he had approved the schedule proposed by

Judy because it serves the needs of the program.  He concluded,

"[w]e will discuss how you can meet our programs needs tomorrow

and if we can come to an agreement I will issue you a new

contract. . . ."  Id., Ex. L.

At 1:43 on the morning of October 9, Plaintiff emailed
Dykes and indicated that she felt uncomfortable meeting with him
alone, without a "neutral witness." Id., Ex. M. She continued
to complain that the proposed schedule was inconsistent with her
August offer and concluded:

> You left me no recourse but to stick with my current
> contract until you could make time to read my emails
> and meet with me about this matter like you did with
> Johanna. I don't believe my tone is cause for a
> disciplinary meeting like you claim just because I am
> asking for equal treatment in this matter.
>
> I feel like you are retaliating against me now for
> making legitimate requests and responses to your
> action and decision that will adversely change the
> terms of my employment and ones which I never offered
> or agreed to.

Id. Later that morning, at 6:07, Plaintiff emailed Dykes and
Judy and informed them that she was not feeling well enough to
come in and teach and requested that they find someone to cover
her classes. Id., Ex. N.

At 9:37 a.m., Plaintiff sent an email to Jorgensen
requesting "a confidential meeting with [him] as soon as
possible to file a formal complaint of discrimination,
harassment and retaliation against [Dykes and Judy]." Jorgensen
Decl., Ex. A. She indicated that she would be bringing a tape
recorder to record the meeting and requested that Stanley Frey,
a member of the SSCCA Board, also be present at the meeting.
Plaintiff repeated that she believed that she was being treated

differently and, unlike Judy, was not permitted to have input into the new schedule. Without providing additional examples, she opined that "[t]his is not the first time I have been treated this way by Mr. Dykes and Johanna and have objected to their unilateral decisions for me that affect me (and my students) adversely and in a discriminatory way." Id. Jorgensen responded one hour later that he could meet with her at 5:00 that evening. Jorgensen Decl., Ex. B.

At 10:45 that morning, Dykes responded to Plaintiff's 6:07 a.m. email to him and stated that he found it "very disappointing" that Plaintiff did not comply with SSCCA policies and procedures which required her to find her own substitute should she be absent from school or to telephone the Headmaster in the case of an emergency absence when she cannot find a substitute. Dykes Decl., Ex. O. He then inquired:

> I need to know when you plan to return to work. I
> will attempt to grant your request by having a Board
> member present when we meet, but you should know that
> you have blown this issue way out of proportion. You
> should read your email to me and ask yourself if any
> subordinate should address their superior in such a
> way as you have. Your allegations are unfounded and
> your deluded confabulations seem bizarre to me at
> best. It was your request to be part time that I was
> honoring by hiring another employee. We discussed
> this several weeks ago. If you had any other specific
> requests they should have been made at that time.
> Understand that requests are just that, they are
> requests. The students in the program will dictate
> the needs and hours you serve.

Dykes Decl., Ex. O.

Dykes then forwarded this email, along with Plaintiff's 6:07 email, to Jorgensen and the other members of the SSCCA Board. Dykes adds an "FYI" to that forwarded email relaying that Judy had reported to him that she had "a peaceful environment to work in for the first time this year" and that she "does not want to see [Plaintiff] return." <u>Id.</u>

At around noon on October 9, Plaintiff forwarded Dykes' email to Jorgensen and instructed him to "[p]lease advice Mr. Dykes to stop sending me harassing emails like the one below." Jorgensen Decl., Ex. D. She states that:

> [Dykes'] age and gender-based name calling (you're delusional, etc) is unacceptable to me and has created a hostile work environment for me along with my prior complaints, so I am asking you to add this new offense to my prior complaints about his discriminatory actions towards me.
>
> . . .
>
> His demands to know when I will return to work below only serve to upset me more and make me afraid to come back there and encounter his hostility with no protection.
>
> I need you to have this stopped immediately or I will be forced to file a restraining order on him and that is the last thing I want to do.

<u>Id.</u>[2]

---

[2] Plaintiff's characterization of this email exchange is telling. She states in her opposition to Defendant's Cross Motion that, from this exchange, it is clear that "Dykes was the one who became agitated, confrontational, argumentative, disrespectful,

Jorgensen telephoned Plaintiff shortly after receiving this email and left a message advising Plaintiff that "things needed to be straightened out before you return" and that "we cannot have ought[3] in the school or the church so get back to me as soon as you can so we can find the time to meet and, uh, see if we can reconcile these things." Pl.'s Ex. 9 to MJP (Plaintiff's transcription of voicemail). Plaintiff, Jorgensen, and Frey participated in a one hour telephone call beginning at 5 o'clock that evening. As described by Frey, Plaintiff indicated that she was unhappy with the new schedule and voiced numerous complaints about Dykes and Judy, yet none of those complaints had anything to do with discrimination on the basis of age or gender. Frey Decl. ¶¶ 6, 7. He relates that Plaintiff described no instance where she was discriminated against based upon age or gender. Id. ¶ 7; see also, Jorgensen Decl. ¶ 10 ("not once during the conversation was Ms. Maynard able to

_____

threatening, and retaliatory when Plaintiff would not agree to his discriminatory breach of her contract. . . . He lost control. He became irrational." ECF No. 106-1 at 7-8. To the contrary, Dykes' email seems a somewhat measured response to an employee trying to dictate the terms of employment to her supervisor as well instructing her supervisor as to when and in what manner he should respond to her terms.

[3] "Ought" appears to be a reference to a word used in the King James Bible in the book of Matthew: "Therefore if thou bring thy gift to the altar, and there rememberest that thy brother hath ought against thee; Leave there thy gift before the altar, and go thy way; first be reconciled to thy brother, and then come and offer thy gift." Matthew 5:23-24 (KJV).

identify, let alone detail, a single instance of discrimination that she suffered at the hands of [Dykes or Judy]").

In her description of the telephone call in one of her declarations,[4] Plaintiff characterizes the telephone call as the filing of "'confidential' formal complaints" of discrimination. Pl.'s Decl. C ¶ 18. She states that her complaints in the telephone call,

> were not about a scheduling or hour conflict. I filed
> my complaints with them because I believe in good
> faith that was I was opposing was unlawful practice by
> Dykes and Judy involving a discriminatory contract
> dispute that I never offered nor agreed to accept. I
> complained to Frey and Jorgensen about a
> discriminatory breach of my contract that involved an
> income cut of $7,000 for part-time terms that favored
> the needs of Johanna Judy, my younger married
> coworker, who had previously informed me that my
> salary was being cut because she needed all of her
> salary to buy a new safer car for her stepchildren and
> family.

Pl.'s Decl. D, ¶¶ 7, 8.

Responding to Plaintiff's suggestion that Plaintiff's relationship with Dykes was such that she felt the need to seek

---

[4] With her reply brief in further support of her motion and in opposition to Defendant's Cross Motion, ECF No. 106, Plaintiff submitted seven different declarations: one in opposition to Defendant's Cross Motion (Pl.'s Decl. A); one to oppose objections raised by Defendant to Plaintiff's exhibits (Pl.'s Decl. G); and one in opposition to each of the five declarations submitted by Defendant with its Cross Motion, one opposing the Declaration of Dykes (Pl.'s Decl. B), one opposing the Declaration of Jorgensen (Pl.'s Decl. C), one opposing the Declaration of Frey (Pl.'s Decl. D), one opposing the Declaration of Rory Rice (Pl.'s Decl. E), and one opposing the Declaration of Judy (Pl.'s Decl. F).

a restraining order against him, Jorgensen informed Plaintiff

that she was suspended, with pay, and that he would be

discussing the matter with the SSCCA Board.  Shortly after this

telephone call, Plaintiff forwarded to Jorgensen the series of

emails between her and Dykes.  Jorgensen and Frey reviewed the

emails and Jorgensen had a conversation with Dykes.  They state

that after their review of the emails and investigation of the

matter, they concluded that there was no evidence of

discrimination.  Instead, in their view, it was Plaintiff's

unhappiness with the proposed schedule that was the primary

cause of the turmoil.  They further concluded that Plaintiff's

emails were inappropriate, demanding, and disrespectful and that

Plaintiff had violated SSCCA policy in the manner that she

called out sick.[5]  Jorgensen and Frey relayed these conclusions

to the SSCCA Board and the Board concluded that the conflict

between Plaintiff and Dykes was creating an unhealthy

---

[5] Frey and Jorgensen also state that their investigation revealed
that Plaintiff "was involved in several past work related issues
that caused strife within the School" and "ultimately found that
Ms. Maynard was the source of a great deal of tension in the
School and Church.  Frey Decl. ¶ 8.  The Board had previously
been made aware of some of these issues.  On August 29, 2014,
Dykes forwarded to the board a series of emails relating to
Plaintiff's complaints regarding the allocation of classroom
supplies.  With those emails, Dykes related that Plaintiff "has
been a distraction in teacher training and just plain strange.
She has few social graces and does not understand her place, nor
appropriate social cues for that matter.  My worse hire yet, but
she does love the kids she serves, and she is a good composition
teacher."  Frey Decl., Ex. A.

environment within the school and the church and that it would
be best if she not return to her teaching position at the
school. Jorgensen Decl. ¶¶ 19, 20

On October 12, 2014, Jorgensen called Plaintiff and offered
her a severance package of three weeks' pay in exchange for her
resignation. Plaintiff refused. Jorgensen then informed
Plaintiff that her employment with SSCCA was terminated. On
October 15, 2014, Jorgensen sent Plaintiff the official
termination letter. Jorgensen Decl., Ex L.

At the time that Plaintiff's employment with SSCCA was
terminated, she was attending another church in the area, Mount
Airy Bible Church (MABC). In October of 2014, she told an
attorney who also attended MABC, Michael Fleming, about her
termination by SSCCA. While he was not an employment attorney,
he offered, as a favor, to call Jorgensen "as a Christian to a
Christian" to work out Plaintiff's "contract breach." Pl.'s
Dep. at 304. Plaintiff stated that it was her intent to try to
work out this contract dispute "within the church arena. . . .
I actually was the one that wanted to follow Matthew 18:15 here,
you know, if a Christian – if a brother or sister wrongs you,
you go one on one, then two on one, then you take it outside the
church if they don't listen to reason." Id. at 305. Fleming
called Jorgensen in early to mid-November and they had a brief
conversation about settling the matter but the settlement

discussion was unsuccessful.  In the course of that conversation, Fleming related that he and Plaintiff attended the same church, MABC.

On November 4, 2014, Plaintiff filed a Charge of Discrimination with the Maryland Commission on Civil Rights (MCCR).  Def.'s Ex. 8.  In early December 2014, Jorgensen learned that Plaintiff had filed the MCCR Charge and that she intended to file a civil suit against SSCCA.  Jorgensen states that relying on "scriptural teachings,"[6] he decided to contact the pastors at MABC "requesting that they counsel Ms. Maynard in regards to what the scriptures teach about Christians suing other Christians."  Jorgensen Decl. ¶ 27.  Jorgensen states that he found the contact information for MABC on the church's website and on December 9, 2014, sent an email to the "Pastor/s"

---

[6] In Defendant's answers to interrogatories, Jorgensen explains that the scripture teaching he was referencing was that found in I Corinthians 6:4-8:

> "Therefore, if you have disputes about such matters, do you ask for a ruling from those whose way of life is scorned in the church?  I say this to shame you. Is it possible that there is nobody among you wise enough to judge a dispute between believers?  But instead, one brother takes another to court—and this in front of unbelievers!  The very fact that you have lawsuits among you means you have been completely defeated already.  Why not rather be wronged?  Why not rather be cheated?  Instead, you yourselves cheat and do wrong, and you do this to your brothers and sisters."

Pl.'s Ex. 3, Def.'s Answer to Interrogatory No. 12.

of MABC.  After identifying himself as pastor of St. Stephen's
and Chairman of SSCCA, Jorgensen wrote "I am of the
understanding that a Ms. Dee Maynard attends your church.  If
that is incorrect please disregard the rest of the email."
Jorgensen Decl., Ex. M.  He then relates that Plaintiff was a
former employee of SSCCA whose employment was terminated in
October and who has expressed her intention to file a civil suit
against St. Stephen's.  He continued, "[o]ur request is that you
graciously pastor Ms. Maynard regarding what the Scriptures
clearly teach about Christians suing Christians," and inviting
them to telephone him "[i]f you would like to know more about
our side of this difficult situation."  Id.

     One day before Jorgensen sent that email, on December 8,
2014, Plaintiff interviewed for an after school, part-time
position that had opened up at the school that is associated
with MABA, the Mount Airy Christian Academy (MACA).  She was
interviewed by Rory Rice, the School Administrator for MACA, and
another member of the MACA staff, Megan Harmon.  Rice states
that, at the end of the interview, Plaintiff was given forms to
complete, was instructed to obtain fingerprints for a background
check, and was told that he would be contacting her references
before a hiring decision would be made.  Rice Decl. ¶¶ 6, 7.
Plaintiff states that she told Rice in the interview that she
would not receive a positive reference from Jorgensen because

they were "still in a dispute," so she gave Rice three other references.  Pl.'s Decl. E ¶ 5.

In addition to his position as School Administrator for MACA, Rice was also an Elder for MABC and, because of his service in that role, Jorgensen's email to the MABA pastors was forwarded to him for consideration.  After receiving Jorgensen's email, Rice relates that he "felt it would be best to look into Ms. Maynard's situation with [Jorgensen and SSCCA]" and he spoke with Fleming.  He states that he never spoke with Jorgensen, that talking to Fleming was the only investigation he undertook regarding the dispute, and that nothing he learned from Fleming influenced Plaintiff's chances at being hired for the MACA position.  Rice Decl. ¶¶ 10, 11.  Rice states further that, as it turned out, he was unable to offer the position to Plaintiff because the MACA librarian, who he describes as "an existing MACA employee who was held in high regard," approached him and asked him to hire her for that position, which he did.  Id. ¶ 12.  He relates, however, that while he could not offer Plaintiff a position at that time, he would keep her information on file should a position arise in the future.  Id. ¶ 15.

Directly contradicting Rice's account, Plaintiff contends that she was offered the position during the interview and that the offer was only rescinded because of Jorgensen's email to MABC.  An email that Plaintiff sent to Rice four days after the

16

interview, however, belies that contention. On December 12, 2014, Plaintiff sent an email to Rice in which she wrote, "I just wanted to touch base with you and Megan about the After School position to see if you have made a decision about it, yet. I . . . was informed that Megan called one of my references, but I haven't heard any more since then. I would appreciate it if you would let me know where I stand in this process." Rice Decl., Ex. A. Rice responded that "[w]e are finalizing the hiring process and will let you know as soon as possible" but "decisions can take some time." Id. Whatever Plaintiff's current contention might be, she certainly did not believe that the position was hers when she sent her email on December 12 and Rice's response confirmed that a decision to hire Plaintiff had yet to be made. Nevertheless, on January 15, 2015, Plaintiff filed a second charge with the MCCR, alleging that Jorgensen's December 9, 2014, email to the pastors of MABC was an additional act of retaliation. Def.'s Ex. 9.

On September 10, 2015, the MCCR issued its Written Findings on both of Plaintiff's charges. Def.'s Exs. 10, 12. Regarding her claims that her suspension and the termination of her employment were retaliatory, the MCCR concluded that its investigation revealed that Plaintiff "continuously displayed resistance towards complying with scheduling changes, school protocols, and administrative authority" and that her employment

17

was terminated "due to 'relational conflicts' between [Plaintiff] and the school staff." Def.'s Ex. 10 at 3, 4.  The MCCR concluded, "[b]ased on the evidence gathered by the Commission staff during the investigation, it has been determined that there is <u>No Probable Cause</u> to believe that [SSCCA] retaliated against [Plaintiff]." <u>Id.</u> at 6.  As for the claim of post-termination retaliation arising out of Jorgensen's email to the pastors of MABC, the Commission concluded that the "investigation was unable to yield any evidence to support [Plaintiff's] allegations that [SSCCA] provided an unfavorable reference in retaliation for opposing a discriminatory activity in the workplace." Def.'s Ex 12 at 5.

While the substance of the Written Finding regarding Plaintiff's suspension and termination clearly reflected the Commission's conclusion that there was no retaliation, Plaintiff has repeatedly attempted to capitalize on what was clearly a typographical error in the original Written Finding.  One sentence in the Written Finding reads "[t]he investigation determined that the [Plaintiff's] termination was based on a retaliatory motive." Def.'s Ex 10 at 5.  Plaintiff cited this typographic error in her opposition to Defendant's motion to dismiss, ECF No. 11 at 5, and that prompted Defendant to ask the MCCR to amend its Written Finding, which the MCCR did on January 26, 2016.  Def.'s Ex. 11 (correcting that sentence to read

"[t]he investigation determined that the [Plaintiff's] termination was not based on a retaliatory motive"). Plaintiff has continued to argue that Defendant's request to correct this obvious error was improper. See, e.g., ECF No. 17 at 3 (in referencing the correcting amendment, "[t]he bias and prejudice is glaring. The non-disclosed collusion is even more disturbing."); ECF No. 75 at 7 (characterizing the amended Finding as "questionable," "unauthorized," and "irrelevant").

The Equal Employment Opportunity Commission issued Plaintiff a Right to Sue Letter on October 27, 2015, and Plaintiff filed this action on November 20, 2015. As explained above, Plaintiff's complaint is now limited to her three retaliation claims under Title VII, arising out of her suspension, the termination of her employment, and the post-termination contact with MABC. Plaintiff has reiterated that these claims are based solely on the actions of Jorgensen and not on any conduct on the part of Dykes or Judy. Defendant has moved for summary judgment on all three claims.

## II. LEGAL STANDARD

Rule 56(b) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered in favor of a moving party when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Rule 56

mandates summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. Trial judges have an affirmative obligation to prevent factually unsupported claims from proceeding to trial. Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1986).

Where, in a case "decided on summary judgment, there have not yet been factual findings by a judge or jury, and [one party's] version of events . . . differs substantially from [the other party's,] . . . courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the [summary judgment] motion." Scott v. Harris, 550 U.S. 372, 378 (2007). However, "[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Id. 550 U.S. at 380.

## III. DISCUSSION

Before addressing the merits of Plaintiff's claims, the Court must consider briefly Plaintiff's Motion to Strike. The gravamen of that motion is that, while the declarations and many of the exhibits submitted by Defendant relate to discrimination and harassment allegedly committed by Dykes and Judy, Plaintiff's "retaliation claims are only against Pastor Eric Jorgensen." ECF No. 103 at 2. In Plaintiff's view, that

renders that evidence irrelevant.  As explained below, however, in order for Plaintiff to establish that she engaged in "protected activity" under Title VII, which is one of the elements of a prima facie claim of retaliation, she must establish that it was objectively reasonable for her to believe that she was discriminated against by Dykes and Judy.  That renders the evidence about Dykes and Judy's conduct relevant to her retaliation claims.

Plaintiff also broadly challenges much of Defendant's evidence as "hearsay" or as statements made "without personal knowledge."  Plaintiff, however, fails to identify examples of what specific statements she believes fall into those categories or, when she provides examples, they are based on mis-representations of the evidence.  For example, she complains that "the bulk of [Jorgensen's] Declaration is focused on his opinion of irrelevant and unsupported hearsay complaints filed against [Plaintiff] by [Dykes and Judy."  ECF No. 103 at 4.  Jorgensen's opinion, however, was largely informed by his review of the emails that Plaintiff forward to him.  Plaintiff complains that Frey was not present when Jorgensen sent the December 9, 2014, email to MABC, "so Frey has no personal knowledge of that matter [] nor is competent to witness anything about it."  ECF No. 103 at 4.  Frey, however, makes no statement about that email in his declaration.

Plaintiff also challenges Defendant's submission of pleadings from administrative proceedings and lawsuits Plaintiff has filed against her other former employers on the grounds of authenticity and relevance. These documents are either in the public record or have been otherwise authenticated. Furthermore, as discussed below, they are relevant to whether Plaintiff had a subjective belief that Dykes and Judy had discriminated against her.

The Court finds nothing objectionable in Defendant's submissions and will deny Plaintiff's motion to strike.

Turning to the merits of Plaintiff's claims, Title VII prohibits an employer from discriminating against an employee because the employee "opposed any practice" made unlawful by Title VII (the "opposition clause"), or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation (the "participation clause"). 42 U.S.C. § 2000e-3(a). A plaintiff can prove a claim of retaliation under Title VII using either direct evidence of retaliation or through the McDonnell Douglas[7] burden-shifting proof scheme. In her motion, Plaintiff proffers that she has presented "direct" evidence of retaliation but never specifies what that direct evidence might be. ECF No. 75 at 2, 4. As this Court has noted, "it is rare for a plaintiff to be able to point to direct

_____

[7] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

evidence of causation," which is "'something akin to an admission from the [employer] that it took action against [the plaintiff] because of his protected activity.'" Childs-Bey v. Mayor & City Council of Baltimore, Civ. No. 10-2835, 2013 WL 5718747 (D. Md. Oct. 17, 2013) (quoting Hobgood v. Illinois Gaming Bd., 731 F.3d 635, 643 (7th Cir. 2013)). There is no such direct evidence here.

To establish a claim of discrimination using indirect evidence under McDonnell Douglas, a plaintiff must first establish a prima facie case of retaliation. See McDonnell Douglas, 411 U.S. at 802. A plaintiff succeeds in establishing a prima facie case by showing: (i) "that [she] engaged in protected activity," (ii) "that [her employer] took adverse action against [her]," and (iii) "that a causal relationship existed between the protected activity and the adverse employment activity." Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004). The burden then shifts to the defendant to show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason. Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004). If the employer makes this showing, the burden shifts back to the plaintiff to rebut the employer's evidence by demonstrating that the employer's purported non-retaliatory reasons "'were not its true reasons, but were a pretext for discrimination.'" Id.

(quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000)).

The Court finds that Plaintiff's first two claims – those related to her three day suspension, with pay, and the termination of her employment – fail because Plaintiff did not engage in protected activity prior to those actions being taken by her employer.[8] An informal complaint of discrimination to one's employer like Plaintiff's telephone conversation with Jorgensen and Frey can rise to the level of protected activity under the opposition clause. While a plaintiff need not prove that the underlying discriminatory conduct that she opposed was actually unlawful, she must show that she had "a good faith, reasonable belief that the employer was engaged in unlawful employment practices." <u>Knott v. DeKalb County School System</u>, 624 Fed. App'x 996, 997 (11th Cir. 2015). "A plaintiff must not only show that she subjectively, in good faith, believed that her employer was engaged in unlawful employment practices, but also that her belief was objectively reasonable in light of the facts and record." <u>Id.</u> at 997-98. "Unfair treatment, absent

---

[8] Plaintiff's suspension claim fails for the additional reason that suspension, <u>with pay</u>, does not rise to the level of an adverse employment action. See <u>Cepada v. Board of Educ. of Baltimore Co.</u>, 974 F. Supp. 2d 772, 789 n.57 (D. Md. 2013) ("Suspension with pay, 'pending a prompt investigation into allegations of wrongdoing,' is not generally considered a materially adverse employment action.") (quoting <u>Jarvis v. Enter. Fleet Servs. & Leasing Co.</u>, Civ. No. DKC 07-3385, 2010 WL 1068146, at *18 (D. Md. Mar. 17, 2010).

discrimination based on race, sex, or national origin, is not an unlawful employment practice under Title VII." Id. at 998.

Plaintiff might be able to convince a jury that Dykes treated her unfairly. There is nothing in the record, however, from which a jury could conclude that Plaintiff had a reasonable belief that his failure to consult her was based on her gender. The whole substance of Plaintiff's complaint is that Dykes treated Judy more favorable than Plaintiff, but Plaintiff and Judy are both of the same gender. Furthermore, during the relevant time period, thirteen of the sixteen employees of SSCCA were females – all except Dykes, Jorgensen, and one teacher. Dyke's Decl., Ex. R. Under these circumstances, the fact that Plaintiff even attempted to attach the label of gender discrimination to her complaint is a clear indication that Plaintiff was attempting to use the threat of a retaliation claim to keep from being fired.

There is no more support for the reasonableness of Plaintiff's claim of age discrimination. During the relevant time period, 60% of those working at SSCCA were over 45 years of age. Id. While Plaintiff tries to characterize her communications with Jorgensen as her complaining of "age discrimination," Plaintiff's own description of the substance of her complaint reveals that even she attributed Dykes' actions to considerations other than age:

> I felt discriminated against when Ms. Judy and Dykes
> used [Judy's] marital status and her need for a family
> car in order to justify their decision to cut my pay
> in 2014 with terms I never offered nor agreed to, so
> Ms. Judy could use her salary to buy a safer car for
> herself and her family.  Being an older, single,
> childless woman, I felt discriminated against and
> taken advantage of.

Pl.'s Decl. F, ¶ 14 (describing what she told the MCCR

investigator as to why she felt discriminated against).  In her

own opinion, while noting that she is "older," it is clear that

Plaintiff attributed Dykes' decisions to Judy's family status

and associated financial needs, and not to Plaintiff's age.

In her effort to support the reasonableness of her

assertion of age related discrimination, Plaintiff asserts that

Dykes called her "derogatory" names in his email, although, in

her deposition, she could not remember what those names were.

Pl.'s Dep. at 241-243.  Plaintiff repeats that assertion

throughout her submissions but, again, without identifying what

those names might be.  The Court's review of the email reveals

that the closest to name calling in which Dykes might have

engaged is his comment that Plaintiff's "allegations are

unfounded and your deluded confabulations seem bizarre to me at

best."  Dykes Decl., Ex. O.  While certainly critical of

Plaintiff's reactions to the scheduling proposal, there is

nothing about that email that reflects discrimination based on age.[9]

The Court finds parallels between this case and a recent case before the Eastern District of New York, Brown v. Northrop Grumman Corporation, Civ. No. 12-1488, 2014 WL 4175795 (E.D.N.Y. Aug. 19, 2014). In Brown, the plaintiff cited as "protected activity" her complaint to her employer's human resources department about emails that she has received from her supervisor that she believed contained "'derogatory comment,' 'name calling,' or 'inappropriate text.'" Id. at *13. The email criticized several aspects of the plaintiff's work product and concluded, "To be blunt, although I like you as a person, I find you argumentative, non-communicative and almost secretive about things. And you ignore direction you don't like." Id. The court dismissed the plaintiff's retaliation claims, concluding,

> Plaintiff could not have reasonably believed that she
> was opposing gender discrimination by complaining

---

[9] Plaintiff's retaliation claim based on opposition to age discrimination fails for an additional reason. With the dismissal of Plaintiff's ADEA claims, Plaintiff's suit is now limited to claims under Title VII. "Title VII does not expressly authorize retaliation claims in response to protected activity opposing age discrimination because it only makes it unlawful for an employer to discriminate against an employee 'because he has opposed any practice made an unlawful employment practice by this subchapter.'" (quoting 42 U.S.C. § 2000e-3(a))). Cyr v. Perry, 301 F. Supp. 2d 527, 535 (E.D. Va. 2004). Discrimination based on age is made unlawful under the ADEA, not Title VII.

about the comments identified in [the emails she
forwarded to the human resources department.]
Although Plaintiff's [] complaint states "[i]f I were
a man, you would not be treating me this way," the
Court must look at the substance of her complaint, not
the terminology that she used.  The comments Plaintiff
complained of constitute general workplace criticism
and carry no implication of discriminatory animus
whatsoever.  Plaintiff argues that her complaints are
protected activity because she "clearly testified that
she believed she was subject to disparate treatment
based upon her gender" and that "the existence of such
testimony" requires presentation of this issue to a
jury.  This argument misses the point.  The test is
not whether Plaintiff had a good faith belief that a
Title VII violation occurred; it is whether Plaintiff
had a good faith, <u>objectively</u> reasonable belief.

Id. (internal quotations and citations omitted).[10]

In this case, there is a question as to whether Plaintiff

ever had a subjective good faith belief that a Title VII

violation occurred.  Defendant notes that Plaintiff has now

filed multiple charges of discrimination and retaliation against

former employers.  In 2001, Plaintiff filed a suit against her

former employer, Comcast Communications of South Florida,

bringing claims of religious discrimination and a claim that her

employer retaliated against her for bring complaints to

management about the differential treatment she suffered.

Def.'s Ex. 14.  In 2008, Plaintiff brought an administrative

---

[10] Plaintiff never explicitly acknowledges that she has a burden
to establish an objectively reasonable belief but repeats only
that she "had subjective belief and good faith that what she was
opposing with Dykes was unlawful" and "[h]er complaints are
clear that she believed in good faith she suffered
discrimination."  ECF No. 106-1 at 7, 9.

charge against a former employer, the School District of Broward County, Florida, which also included claims of retaliation. Def.'s Ex. 15. In 2013, Plaintiff filed an administrative charge with the EEOC against a former employer, the Therapeutic and Recreational Riding Center, alleging that her supervisor treated young female employees and male employees differently than her and called her derogatory names. Def.'s Ex. 16. Plaintiff has another suit currently pending in the United States District Court for the District of Connecticut against a former employer, the Stonington Community Center. Def.'s Ex. 17. That action includes allegations of discrimination and retaliation very similar to those alleged here.

This pattern of filing lawsuits might explain the language Plaintiff used in her interactions with Jorgensen. When Plaintiff emailed Jorgensen to request a meeting, it was not to simply tell him about her complaints about Dyke's scheduling, it was to "file a formal complaint of discrimination, harassment and retaliation." The language she used seemed tailored to convey that message that, if Jorgensen were to discipline her, that SSCCA would face a claim of retalitation. The language used by Plaintiff in her motion reflects that same intention. Plaintiff argues that "it is irrelevant whether my complaints to Jorgensen and Frey against Dykes and Judy on 10/09/14 were found to be true or not. I was already in 'protected activity' the

minute I filed them."  ECF No. 75 at 1; see also id. at 4

(repeating her contention that once she complained of Jorgensen,

"that immediately placed me in 'protected activity.'").

Plaintiff's communication with Jorgensen has all the

earmarks of a pre-emptive "opposition to discrimination" that

the Supreme Court cautioned against in Univ. of Texas

Southwestern Medical Center v. Nassar.

> Consider in this regard the case of an employee who
> knows that he or she is about to be fired for poor
> performance, given a lower pay grade, or even just
> transferred to a different assignment or location.  To
> forestall that lawful action, he or she might be
> tempted to make an unfounded charge of racial, sexual,
> or religious discrimination; then, when the unrelated
> employment action comes, the employee could allege
> that it is retaliation.

133 S. Ct. 2517, 2532 (2013).

The Court need not resolve, however, the question as to

whether Plaintiff subjectively believed that she was being

discriminated against, because it concludes that any belief she

may have was not objectively reasonable.  Accordingly, her

complaining to Jorgensen was not protected activity and she

fails to establish a prima facie case of retaliation related to

her suspension or the termination of her employment.

As to Plaintiff's retaliation claim related to Jorgensen's

email to the pastors at MABC, the Court finds that Plaintiff has

not established a prima facie case because she cannot establish

that the email resulted in an adverse employment action.[11]  While

one might question Jorgensen's judgment in sending his December

9, 2014, email to the MABC pastors, there is nothing in the

record to indicate that it harmed Plaintiff in any way.

Contrary to Plaintiff's current contentions, Rice had not

offered her the position and he states that Jorgensen's email

played no role in his hiring decision.  Instead, he hired an

individual who was already employed part-time at MACA and was

looking for more hours.

Plaintiff's efforts to create a dispute of fact on this

issue are unavailing.  In her opposition to Defendant's motion,

Plaintiff makes the rather curious argument that

> Defendant wasn't present when the Plaintiff
> interviewed with Rory Rice in order to have personal
> knowledge about this matter, and it is undisputed that
> Rice never made an official authenticated recording of
> the interview to support his opinion that he made no
> job offer.  They are not competent to make such a
> legal conclusion like this.  It is their biased
> opinion and is inadmissible.

ECF No. 106-1 at 10.  Rice, of course, was present at the

interview and Plaintiff provides no explanation as to why he

would be biased.  Plaintiff also admits that it is Rice's

opinion that he made no job offer.

---

[11] Although not raised in the Complaint, Plaintiff suggests in
her motion that she "suspected Jorgensen was behind" other
missed job opportunities.  ECF No. 75 at 20.  Plaintiff offers
no support for these suspicions.

Plaintiff correctly observes that, to prove an adverse employment action, she need not establish that she already had an offer of employment before Rice saw Jorgensen's email, she need only establish that Rice made a different decision because of the email.  The record does not support that conclusion, either.  Rice stated that he gave the position to a current member of MABC who was a "valued member of the MACA team," "was held in high regard," and who approached him for the position after Plaintiff's interview.  Rice Decl. ¶ 12.[12]  Plaintiff attempts to re-characterize Rice's statement as indicating that, after receiving Jorgensen's email, "[a]ll of the sudden, Rice held the Plaintiff in 'less regard' and sees the Plaintiff as a less 'valuable' church member."  ECF No. 106-1 at 13.  Rice statement, was not comparative and it is certainly a reasonable business decision to expand the hours of a respected employee.

Finding no evidence that Jorgensen's email to MABC resulted in Plaintiff's loss of the position at MACA, the Court concludes that Defendant is entitled to summary judgment on Plaintiff' third and final retaliation claim as well.

---

[12] Plaintiff makes another peculiar argument in this regard.  She states that "Rice admitted that the member he hired approached and asked Rice for the job, after he received Jorgensen's email on Friday 12/12/14, not the other way around."  ECF No. 106-1 at 13.  That observation undermines, not supports, Plaintiff's position.

**IV. CONCLUSION**

For all of the above stated reasons, the Court concludes that Plaintiff's motion to strike and motion for judgment on the pleadings should be denied and Defendant's motion for summary judgment granted. A separate order will issue.

_____/s/_____
William M. Nickerson
Senior United States District Judge

DATED: July 5, 2017